**ANGELA K. ZUGMAN**
California Bar No. 216374
LAW OFFICE OF ANGELA K. ZUGMAN
1010 2nd Avenue, Suite 1800
San Diego, California 92101
Phone Number: (619) 787-5334
Fax Number: (619) 924-2201
Email: akzugman@gmail.com

**TIMOTHY A. SCOTT**
California Bar No. 215074
**NICOLAS O. JIMENEZ**
California Bar No. 295057
LAW OFFICES OF
TIMOTHY A. SCOTT, APC
1350 Columbia St., Suite 600
San Diego, California 92101
Phone Number: (619) 794-0451
Fax Number: (619) 652-9964
Email: tscott@timscottlaw.com
noj@timscottlaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Estate of Gerardo Cruz-Sanchez, by and through his successor-in-interest Paula Garcia Rivera; and Paula Garcia Rivera, individually and in her capacity as successor-in-interest, <br><br> Plaintiffs, <br><br> v. <br><br> United States of America; CoreCivic, Inc. formerly known as Corrections Corporation of America (CCA); C.O. Landin, in his individual and official capacities; and Does 1-20, inclusive, <br><br> Defendants. | Civil No. 17-CV-00569-BEN-NLS <br><br> **SECOND AMENDED COMPLAINT FOR:** <br><br> 1.   **FTCA: Wrongful Death;** <br><br> 2.   **FTCA: Negligence;** <br><br> 3.   **FTCA: Negligent training and supervision;** <br><br> 4.   **FTCA: Negligent infliction of emotional distress;** <br><br> 5.   **Violation of Bane Act;** <br><br> 6.   **Negligence;** |

1

7.     **Wrongful death (CCP §**
       **377.60);**

8.     **Negligent training and**
       **supervision;**

9.     **Negligent infliction of**
       **emotional distress;**

10.    **Breach of duty owed by**
       **special relationship between**
       **Jailer and Jailee; and**

**DEMAND FOR JURY TRIAL ON**
**NON-FTCA CLAIMS**

The Estate of Gerardo Cruz-Sanchez, by and through his successor-in-interest Paula Garcia Rivera and Paula Garcia Rivera, individually and in her capacity as successor-in-interest, by and through their attorneys of record, state and allege as follows:

## I.     INTRODUCTION

1.     In early February 2016, the United States arrested and incarcerated Gerardo Cruz-Sanchez.  But he was not charged with any crime. Rather, the United States arrested him because he was a witness to the crime of alien-smuggling. The government held him in order to prosecute an alien-smuggling defendant in federal court.  Mr. Cruz-Sanchez cooperated with the government. He agreed to testify against the alien-smuggling defendant.  But he could not afford bail. So on February 11, 2016, Mr. Cruz-Sanchez was admitted into CoreCivic, Inc.'s Otay Mesa Detention Center. 18 later, he was dead.

2

Mr. Cruz-Sanchez was a healthy man when he arrived at Otay Mesa Detention Center as a government witness. On or about February 9, 2016, he received a chest x-ray which confirmed no signs of tuberculosis or pneumonia. But after he was incarcerated, he contracted pneumonia and was soon incapacitated to the point that he could not talk or eat. He was in constant—and obvious—pain and distress. He vomited blood, soaking his clothes and sheets. He pleaded for medical help day after day—as did his cellmate on his behalf. But their pleas were ignored and mocked by the prison staff, who instead threatened them to make them stop complaining.  Less than three weeks later, on February 29, 2016, Gerardo Cruz-Sanchez was pronounced dead at the hospital. He would be alive today if the authorities had honored their legal and moral duty to care for their own witness. This lawsuit seeks justice on behalf of Mr. Cruz-Sanchez and the family that he left behind.

## II.   JURISDICTION

2.     This Court has jurisdiction to hear this case pursuant to Title 28 U.S.C. §§ 1332(a)(2) (Diversity) and 1346(b)(1) (United States as Defendant).

3.     With respect to the claims stated herein based upon state law, this Court has supplemental jurisdiction. *See* Title 28 U.S.C. § 1367(a); *Allen v. City of Los Angeles*, 92 F.3d 842, 945 (9th Cir. 1996).

4.     The Southern District of California is the proper venue because the acts and omissions alleged herein occurred in San Diego, California, which is located within the Southern District of California. *See* Title 28 U.S.C. §§ 1391(e), 1402(b), and 1346.

5.     Plaintiffs' claims under 18 U.S.C. §§ 1345 and 2671-2680 (Federal Tort Claims Act) were timely filed on August 30, 2016. Six months have elapsed; all conditions precedent to the Federal Tort Claims Act have been met.

3

### III.   PARTIES

6.     Before his death, Gerardo Cruz-Sanchez was, at all times relevant to this lawsuit, a resident of Mexico. He was being held by the United States as a material witness in Case No. 16cr405-BAS, United States v. Ortega-Gonzalez. His wife, Paula Garcia Rivera, at all times relevant to this lawsuit, was a resident of Mexico. She is the duly appointed successor-in-interest to the Estate of Gerardo Cruz-Sanchez. *See* **Exhibit A** (Declaration of Paula Garcia Rivera).

7.     At all times relevant to this complaint, the U.S. Immigration and Customs Enforcement (ICE) Health Service Corps (IHSC) was a federal agency of defendant United States of America ("United States") and was operating in San Diego County, California. IHSC is made up of a multi sector, multidisciplinary workforce of over 1,100 personnel that include U.S. Public Health Service (PHS) Commissioned Corps officers, federal civil servants and contract health professionals. IHSC and PHS provide direct care to approximately 13,500 detainees, including material witnesses, housed at 21 designated facilities throughout the Nation to include medical, dental and mental health care, and public health services.

8.     At all times relevant to this complaint, Defendant CoreCivic, Inc. formerly known as Corrections Corporation of America, Inc. (herein referred to as "CoreCivic") is a for-profit Maryland corporation whose principal office is located at 10 Burton Hills Boulevard, Nashville, Tennessee 37215 and whose registered agent for service of process is CT Corporation System, 800 Gay Street, Suite 2021, Knoxville, Tennessee 37929. As part of CoreCivic's business, it owns/operates jails, prisons and other correctional facilities throughout the United States under contract with various government entities. At all times relevant to this action,

CoreCivic conducted business within San Diego County when operating its Otay Mesa Detention Center.

9.     Defendant C.O. Landin ("Landin") is, and at all times herein mentioned was, an agent or employee of CoreCivic who worked as a correctional officer at CoreCivic's Otay Mesa Detention Center.  Defendant Landin was directly involved in Mr. Cruz-Sanchez's treatment in the jail. He is sued in his individual and official capacities.

10.     Plaintiffs are truly ignorant of the true names and capacities of Does 1 through 20, inclusive, and/or are truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability.

11.     These defendants were agents, servants and employees of each of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer and each of the other named defendants. Each of the defendants had approved or ratified the actions of the other defendants, thereby making the currently named defendants liable for the acts and/or omissions of their agents, servants and/or employees.

**IV.  FACTS SUPPORTING CAUSES OF ACTIONS**

12.     As described above, U.S. Immigration and Customs Enforcement (ICE) Health Service Corps (IHSC), a federal agency of Defendant United States, is the only entity in ICE with the responsibility of providing direct patient care. IHSC is made up of a multi sector, multidisciplinary workforce of over 1,100 personnel that include U.S. Public Health Service (PHS) Commissioned Corps officers, federal civil servants and contract health professionals. IHSC and PHS

5

provide direct care to approximately 13,500 detainees, including material witnesses, housed at 21 designated facilities throughout the Nation to include medical, dental and mental health care, and public health services. IHSC and PHS also provide medical case management and oversight for an additional 15,000 detainees, including material witnesses, housed at approximately 119 non IHSC staffed detention facilities across the country. In addition, IHSC oversees the financial authorization and payment for offsite specialty and emergency care services for detainees, including material witnesses, in ICE custody. PHS is responsible for providing all health care services to detainees, including material witnesses, at Otay Mesa Detention Center, a facility run by CoreCivic.

13.   Decedent Gerardo Cruz-Sanchez was a Mexican male citizen born on February 18, 1964. His native language was Spanish. He did not speak or understand English.

14.   On February 11, 2016, Mr. Cruz-Sanchez was admitted to CoreCivic's Otay Mesa Detention Center ("OMDC") following his arrest by federal officers. He was detained as a material witness in a case being brought by the United States; no criminal charges were pending against him.

15.   That same day, E. Ednacot, a PHS registered nurse, performed an initial assessment on Mr. Cruz-Sanchez.

16.   During the initial assessment, Mr. Cruz-Sanchez had no complaints and did not require any medications.

17.   During Mr. Cruz-Sanchez's detention, CoreCivic and PHS had a "sick call" protocol at OMDC.

18.   Pursuant to the OMDC Detainee Handbook, the detention officer was obligated to announce sick call every morning between 0500-0600 hours.

19.     If a detainee wished to sign up for medical, dental or mental health services, he would sign the "Sick Call Request Log" and include his name, identification number, housing pod, cell number and the service requested (e.g. medical, dental, or mental health).

20.     Under the OMDC sick call procedure, an officer was required to assist any detainee who had trouble reading or writing in filling out a sick call request.

21.     Under the OMDC sick call procedure, a registered nurse was supposed to speak to the detainee the same day to assess his sick call request.

22.     The nurse was then supposed to review the detainee's concerns with a health-care provider and schedule him for an appointment.

23.     According to policy, all Sick Call Request Logs are supposed to be kept electronically by ICE.

24.     A few days after being admitted into CoreCivic's OMDC, Mr. Cruz-Sanchez developed flu like symptoms, including headache, sore throat, painful burning sensation, a persistent cough, nasal congestion, fatigue, and loss of appetite.

25.     Mr. Cruz-Sanchez waited for an officer to circulate the "Sick Call Request Log" so he could be seen by a PHS medical provider.

26.     On February 14, 2016, Mr. Cruz-Sanchez was seen by PHS Nurse J. Alix.

27.     During this February 14, 2016 visit, Mr. Cruz-Sanchez described his flu like symptoms that had been ongoing for 2 days. He also indicated that he was experiencing severe pain.

28.     Nurse J. Alix noted that his appointment was due to upper respiratory infection ("URI") during this same February 14 visit.

29.     But Nurse J. Alix did not order a chest x-ray for Mr. Cruz-Sanchez.

30.     Nurse J. Alix did not refer Mr. Cruz-Sanchez to a licensed physician for further examination.

31.     Instead, Mr. Cruz-Sanchez was given Ibuprofen 200 MG tablets and sent back to his cell.

32.     Over the next couple of days, Mr. Cruz-Sanchez's symptoms worsened.

33.     Mr. Cruz-Sanchez submitted another sick call request and was seen by PHS Nurse V. Harris on February 16, 2016.

34.     At this visit, he informed V. Harris that he had a productive cough, body aches, and a sore throat for about a week.

35.     At this February 16 visit, Mr. Cruz-Sanchez described his pain level as severe and rated it as 9/10.

36.     V. Harris did not order a chest x-ray either.

37.     V. Harris did not refer Mr. Cruz-Sanchez to a licensed physician for further examination.

38.     Instead, Mr. Cruz-Sanchez was given additional Ibuprofen tablets and salt packets and sent back to his cell.

39.     Mr. Cruz-Sanchez submitted another sick call request and was seen on February 17, 2016. At this visit, he was seen by PHS Physician's Assistant J. Avalos.

40.     Mr. Cruz-Sanchez reported to J. Avalos that he had flu-like symptoms for several days including fever at night, chills, nausea throughout the day, lack of appetite and scratchy throat.

41.     Mr. Cruz-Sanchez told J. Avalos that he was in pain and that his body ached.

42.     J. Avalos is not a licensed physician.

43.     J. Avalos noted in his chart that Mr. Cruz-Sanchez had a "viral etiology vs. bacterial or allergy."

44.     But J. Avalos did not check his oxygen levels.

45.     J. Avalos also did not order a chest x-ray.

46.     J. Avalos did not order a blood culture either.

47.     Despite knowing Mr. Cruz-Sanchez was displaying symptoms indicative of pneumonia, J. Avalos did not refer him to a licensed physician for further examination.

48.     Instead, Mr. Cruz-Sanchez was given increased dosages of Ibuprofen and Promethazine (an allergy medication) and sent back to his cell.

49.     On February 21, 2016, Mr. Cruz-Sanchez was seen by PHS Nurse W. Byington.

50.     Nurse W. Byington did not check Mr. Cruz-Sanchez's oxygen levels.

51.     W. Byington did not order a chest x-ray either.

52.     W. Byington also did not order a blood culture.

53.     After this February 21st visit, Mr. Cruz-Sanchez's health continued to deteriorate. He began coughing up blood, saturating his clothes and bed sheets.

54.     Mr. Cruz-Sanchez and his cellmate, Alejandro Chavez, pleaded with C.O. Landin and other correctional staff to give him urgent medical treatment.

55.     Between February 22 and February 26, Mr. Cruz-Sanchez received no medical care.

56.     Between February 22 and February 26, Mr. Cruz-Sanchez's condition deteriorated to the point where he was unable to talk and could not swallow food due to swollen throat glands.

57.     His ongoing symptoms included shortness of breath, respiratory distress, and wheezing.

58.     Between February 22 and February 26, Mr. Cruz-Sanchez was in constant pain, which was obvious and visible to those who saw him, including his cellmate, Alejandro Chavez.

59.     On or about February 22, 2016, Daniela Leyva, a Spanish interpreter, visited Mr. Cruz-Sanchez and Alejandro Chavez at CoreCivic's OMDC.  Ms. Leyva observed that Gerardo Cruz-Sanchez was pale, sickly, and unable to speak. Alejandro Chavez told Ms. Leyva that Mr. Cruz-Sanchez was very sick.

60.     On or about February 22, 2016, Gerardo Cruz-Sanchez told Alejandro Chavez to contact his father if he does not make it out of jail. Alejandro Chavez believed Mr. Cruz-Sanchez was on the brink of death.

61.     On or about February 24, 2016, Alejandro Chavez again begged C.O. Landin to get medical help for Mr. Cruz-Sanchez.

62.     C.O. Landin was the only correctional officer Alejandro Chavez knew to understand him.

63.     C.O. Landin told Alejandro Chavez that Mr. Cruz-Sanchez "needs to be nearly dead to be taken to a hospital."

64.     Alejandro Chavez also heard C.O. Landin mocking and intimidating Mr. Cruz-Sanchez to "man up" and "stop being a chicken."

65.     C.O. Landin also threatened both Mr. Cruz-Sanchez and Alejandro Chavez that they would regret it if they continued requesting medical care and, in his words, "complaining."

66.     C.O. Landin also mocked Alejandro Chavez for acting like Mr. Cruz-Sanchez's "girlfriend or wife."

67.     Between February 22-February 25, 2016, no PHS medical provider followed up on Mr. Cruz-Sanchez's medical situation.

68.     Between February 22-February 25, 2016, C.O. Landin refused to assist Mr. Cruz-Sanchez in submitting additional sick call requests. Mr. Cruz-Sanchez continued to cough up blood, soaking his clothes and bed sheets.

69.     On February 25, 2016, Dr. E. Lederman electronically signed off on W. Byington's February 21st assessment of Mr. Cruz-Sanchez.

70.     But E. Lederman did not review the electronic notes made by E. Ednacot, J. Wu, J. Alix, V. Harris, J. Behr, and J. Avalos before signing off on the February 21st assessment.

71.     Had E. Lederman reviewed those earlier notes, she would have observed that Mr. Cruz-Sanchez's flu-like symptoms and worsening health crisis suggested possible pneumonia.

72.     On the morning of February 26, 2016, Mr. Cruz-Sanchez could not get up from bed. His mattress was covered in blood. Alejandro Chavez and another detainee, Carlos (last name unknown), physically picked up Mr. Cruz-Sanchez and dragged him to a table in the common area to get him to eat. Mr. Cruz-Sanchez coughed up blood on the table. C.O. Landin, seeing this episode, scolded and intimidated Mr. Cruz-Sanchez yelling "Why are you making a mess! This is where everyone eats!" C.O. Landin then ordered Mr. Cruz-Sanchez to get down on the ground. The other detainees, including Alejandro Chavez and Carlos, were ordered back to their cells.

73.     Between 2:00-3:00 p.m. on February 26, 2016, a medical emergency was called by CoreCivic staff and Mr. Cruz-Sanchez was brought to the OMDC medical facility where he was examined by Dr. T. Propst.

74.     Dr. Propst noted that Mr. Cruz-Sanchez had chest pain and hypoxemia.

75.     He also noted "spit up of blood" and that Mr. Cruz-Sanchez had URI (upper respiratory infection) symptoms most of the two weeks since intake.

76.     Mr. Cruz-Sanchez's oxygen levels were low and Dr. Propst diagnosed Mr. Cruz-Sanchez with "acute respiratory distress w/burning chest pain, cough, subcut emphysema, hypoxemia, tachypnea, tachycardia – suspect spontaneous pneumothorax vs. other cardiopulmonary or GI etiology."

77.     Mr. Cruz-Sanchez's condition was severe enough that a 911 call was made, and Mr. Cruz-Sanchez was transported by ambulance to the emergency room at Scripps Mercy Hospital in Chula Vista, California.

78.     According to post-mortem records, "at the emergency room, the medical staff intubated him and placed him on mechanical ventilation. His examination and laboratory test results showed him with diagnoses of pneumomediastinum with extensive subcutaneous emphysema, hypoxemia, acute kidney injury, healthcare associated pneumonia, new onset of diabetes and hypokalemia. They admitted him into the intensive care unit with full code status."

79.     On or about February 27, 2016, Alejandro Chavez saw C.O. Landin and inquired about Mr. Cruz-Sanchez. C.O. Landin told him, "Oh, he's dead. Just kidding!"

80.     On February 29, 2016, Gerardo Cruz-Sanchez was pronounced dead at the hospital. His Death Diagnoses: (1) Aystyolic cardiac arrest secondary to metabolic acidosis; (2) Multifocal pneumonia with acute respiratory distress syndrome; (3) Hypoxic respiratory failure secondary to multifocal pneumonia and acute respiratory syndrome; (4) Acute kidney injury secondary to acute tubular necrosis; (5) Hyperkalemia secondary to acute kidney injury; and (6) Pneumomediastinum and subcutaneous emphysema.

81.     Defendants deliberately ignored Mr. Cruz-Sanchez's repeated pleas for help during his prolonged health crisis. Prior to February 26, 2016, Mr. Cruz-Sanchez was never examined by a physician. Despite submitting at least 4 sick call

12

requests, Mr. Cruz-Sanchez was never referred to a licensed physician for further examination. The only time he saw a physician was in the afternoon of February 26, 2016, right before he was rushed to the ER.

82.     Mr. Cruz-Sanchez's death could have been prevented if defendants did not deliberately, oppressively, and maliciously ignore his medical crisis.

83.     Defendant United States had custody and control over Mr. Cruz-Sanchez's body.

84.     Mr. Cruz-Sanchez's body was not delivered to Plaintiff Paula Garcia Rivera until April 1, 2016, 32 days after he died.

85.     Mr. Cruz-Sanchez's body was delivered to his wife in a gray steel box.

86.     When Plaintiff Paula Garcia Rivera saw her husband's dead body, his face was bruised, his wrists had deep red marks and bruises, his ears were swollen and distended.

87.     Plaintiff Paula Garcia Rivera and her family members were shocked and traumatized to see Mr. Cruz-Sanchez's body mistreated.

88.     Plaintiff Paula Garcia Rivera made numerous attempts to obtain Mr. Cruz-Sanchez's medical records from CoreCivic's OMDC. Her requests were ignored until the Court denied the United States' motion to stay discovery on July 6, 2017 (Docket No. 22).

89.     This course of action and inaction breached a host of rules and standards governing the provision of health care by the United States to detainees.

90.      Defendant United States through its agents/employees, the U.S. Immigration and Customs Enforcement (ICE) Health Service Corps (IHSC) and U.S. Public Health Service (PHS), is required to provide direct patient care to the federal detainees at CoreCivic's Otay Mesa Detention Center including its own material witnesses.

13

91.    The United States was well-aware of these rules and standards.  A 2007 lawsuit by the American Civil Liberties Union against CoreCivic's San Diego immigrant detention centers, including its Otay Mesa Detention Center, prompted the Department of Immigration Health Services to take over provision of medical care at these facilities. The lawsuit alleged that CoreCivic squeezed profit from its immigrant detention contracts by scrimping on the already minimal services it was required to provide, including attempting to increase its profits by decreasing medical services provided to detainees. The lawsuit also alleged that detainees had to endure lengthy waits for medical treatment and did not get the medications needed for chronic illnesses.

92.    The ACLU lawsuit settled in December 2010 with an agreement that the government would provide a broader range of treatment. The settlement required that ICE meet or exceed specified standards of care detailed by the national Commission on Correctional Health Care, specifically eliminating from its written policies statements saying detainees will receive only emergency care, and instead mandating detainees will receive care whenever it is necessary to address a serious medical need.

93.    Medical facilities within ICE detention facilities are required to achieve and maintain current accreditation with the National Commission on Correctional Health Care (NCCHC), and maintain compliance with those standards. ICE further revised its detention standards in 2011, referred to as the Performance-Based National Detention Standards 2011 (PBNDS 2011).  These standards applied to the care that Gerardo Cruz-Sanchez received and should have received.

94.    Pursuant to NCCHC Standard J-E-07 "[I]n general, when an inmate reports to sick call more than two times with the same complaint and has not seen a physician, he or she receives an appointment to do so."

14

95.     Mr. Cruz-Sanchez submitted at least 4 sick call requests and was not seen by a physician until the day he was rushed to the ER.

96.     Pursuant to NCCHC Standard J-C-04 "[B]ecause correctional personnel are often the first to respond to problems, they must be aware of the potential emergencies that may arise, know the proper response to life-threatening situations, and understand their part in the early detection of illness and injury."

97.     C.O. Landin, in contrast, deliberately ignored Mr. Cruz-Sanchez's life-threatening situation.

98.     The ICE PBNDS, Medical Care, Section (II)(1) requires that detainees, "have access to a continuum of health care services, including prevention, health education, diagnosis, and treatment."

99.      The ICE PBNDS 2011, Medical Care, Section (II)(7), requires that, "a detainee who needs health care beyond facility resources will be transferred in a timely manner to an appropriate facility where care is available."

100.    The ICE PBNDS 2011, Medical Care, Section (II)(10), requires that detainees have, "access to specified 24-hour emergency medical…services."

101.    Pursuant to the Defendant United States' Contract with Defendant CoreCivic, USPHS and CoreCivic were required to ensure that all employees received pre-service and annual training in the "Recognition of signs and symptoms, and knowledge of action required in potential emergency situations," and "Procedures for patient transfers to appropriate medical facilities or health care providers."

102.    On July 7, 2016, the Human Rights Watch published an article, entitled "US: Deaths in Immigration Detention - Newly Released Records Suggest Dangerous Lapses in Medical Care." According to the article, "[N]ewly released United States government records summarizing investigations of the deaths of 18

15

migrants in the custody of US immigration authorities support a conclusion that subpar care contributed to at least seven of the deaths."

103.   According to the Human Rights Watch, one of the people the two medical experts identified as having received substandard care was 34-year-old Manuel Cota-Domingo, who died of heart disease, untreated diabetes, and pneumonia in December 2012 at St. Joseph's Hospital and Medical Center shortly after being transferred there from Eloy Detention Center, a private facility run by the CoreCivic.

104.   The death review for Manuel Cota-Domingo contained "*persuasive evidence that correctional officers did not respond to calls for help for approximately three hours while Cota-Domingo was having trouble breathing. When officers finally notified medical providers of his condition, they delayed evaluating him and finally sent him to the hospital in a van instead of an ambulance. Both medical experts concluded that the combination of these delays likely contributed to a potentially treatable condition becoming fatal*."

105.   Defendant CoreCivic also has a non-delegable duty to ensure that the conditions of confinement and health and safety of persons incarcerated at CoreCivic's Otay Mesa Detention Center, including Gerardo Cruz-Sanchez, are protected and in compliance with the Constitutions and laws of the United States and the State of California.

106.   Defendant CoreCivic has a widespread practice, custom, habit and policy of tolerating and encouraging deliberate indifference to known serious medical needs in the form of refusals of higher level care, refusing to transfer inmates to the hospital even when they are complaining of serious and life threatening medical needs, of treating inmates like they are faking their illnesses.

16

107.   Defendant CoreCivic owns and operates many private jails around the country and has been sued hundreds of times for similar patterns of reckless deliberate indifference, including but not limited to the cases described in the following paragraphs.

108.   A 2001 jury verdict related to an inmate whose jaw was left wired shut for 10 weeks, the jury wrote that they hoped the message sent by the verdict would "echo throughout the halls of your corporate offices as well as your corporate housing facilities."

109.   In 2004 a mother filed a lawsuit against CoreCivic for her son's death at the CoreCivic-run Kit Carson Correctional Center in Colorado. The deceased inmate suffered from a hereditary condition that caused his breathing passages to swell, a condition that had been easily and effectively controlled with the prescription medication Winstrol. The Plaintiff mother alleged that CoreCivic personnel refused to give her son his medically necessary Winstrol medication, causing his death from an easily treatable condition.

110.   CoreCivic prisons have been sued at least three times since 2004 for denying needed medical care to pregnant women causing injury to the women and the death of their babies. In one of these cases, an inmate who complained of bleeding was returned to her cell so her bleeding could be monitored to prove she wasn't making up her complaints.

111.   In 2010 inmate Terrell Griswold died at CoreCivic's Bent County Correctional Facility of a treatable condition. His parents sued the doctor and the facility, alleging that their son's continuous complaints and series of requests for medical care were ignored. The lawsuit alleges that CoreCivic staff also refused to send Mr. Griswold outside the facility for necessary higher-level care. Mr. Griswold eventually died from easily treatable urinary blockage.

17

112.   In 2013 the Texas state legislature shut down CoreCivic-run Dawson State Jail following the deaths of inmates who died of treatable medical conditions. One of the deceased prisoners was Pam Weatherby, who died at CoreCivic's Dawson State Jail in May 2010 after not being provided with the state-mandated special diet for diabetic prisoners, and after being taken off her insulin shots, contrary to her well-documented treatment plan.

113.   In July 2016, Mother Jones magazine published an article by a reporter who worked for CoreCivic for four months as a private prison guard. The article recounts the story of an inmate named Robert Scott who lost both legs and several fingers to gangrene despite complaining over and over to staff at a CoreCivic prison in Louisiana. Mr. Scott's lawsuit alleges that he complained many times, like Gerardo Cruz-Sanchez, and that he was offered cheap and irrelevant treatments like corn removal strips, and told that if he didn't stop complaining he would get a write up for malingering.

114.   More recently, on January 6, 2017, the Estate of Dennis Choquette sued CoreCivic's Bent County Correctional Facility in Colorado for deliberate indifference to Plaintiff's serious medical needs. The lawsuit alleges that CoreCivic staff knew Mr. Choquette was diagnosed with left-footed Charcot Syndrome, which required protective devices and offloading. CoreCivic's refusal to treat his known serious medical condition resulted in Mr. Choquette's left foot being damaged to the point of complete deformity and repeated infections, ultimately leading to his death.

115.   CoreCivic is responsible for the implementation of policies, procedures, practices and customs, as well as the acts and omissions, challenged by this lawsuit.  CoreCivic is liable for its own conduct and the acts and omissions of its servants, employees, agents and contractors pursuant to the doctrines of agency,

apparent agency, implied agency, employer/employee relations, joint and several liability, respondeat superior, vicarious liability, contract and as a result of CoreCivic's non-delegable duty to ensure the health and safety of the persons held in custody at CoreCivic's OMDC.

## V.   CAUSES OF ACTION

### CLAIM 1:   FTCA claim against Defendant United States for wrongful death.

116.   Plaintiffs reassert and re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

117.   Defendant United States had a duty to use reasonable care when attending to the medical needs and health of material witnesses at CoreCivic's Otay Mesa Detention Center.

118.   Defendant United States breached its duty of care by failing to exercise ordinary care and due diligence.  United States' treatment of Gerardo Cruz-Sanchez while he was detained at CoreCivic's Otay Mesa Detention Center violated the FTCA, 28 U.S.C. § 2674.

119.   As a direct and proximate result of Defendant United States' conduct as alleged herein, the wrongful death of Gerardo Cruz-Sanchez occurred. Plaintiff Paula Garcia Rivera has been, and will be, deprived of the love, care, society, affection, comfort, moral support, protection, companionship, services, and support of her husband.

120.   As a further direct and proximate result of the acts and omissions of Defendant United States and the wrongful death of Gerardo Cruz-Sanchez, Plaintiffs have incurred monetary damages, including but not limited to loss of support, services and funeral expenses.

/ / /

19

**CLAIM 2:   FTCA claim against Defendant United States for Negligence.**

121.   Plaintiffs reassert and re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

122.   Defendant United States had a duty to use reasonable care when attending to the medical needs and health of immigration detainees, including material witnesses, at CoreCivic's Otay Mesa Detention Center.  Defendant United States had a duty to avoid creating an unnecessary risk that immigration detainees, including material witnesses, would suffer or die from medical conditions. Defendant United States had a duty to use reasonable care in evaluating the health of immigration detainees, including material witnesses, and determining the proper and adequate course of treatment. Defendant United States had a duty to provide proper care to Gerardo Cruz-Sanchez who contracted pneumonia while in custody.

123.   Defendant United States carelessly and negligently treated, managed, monitored, supervised or altogether ignored Gerardo Cruz-Sanchez's prolonged health crisis during his detention between February 10, 2016 and February 26, 2016.

124.   Defendant United States breached its duty of care and caused harm to Plaintiffs, including physical pain and suffering, terror, mental anguish, humiliation, degradation, and financial loss.  United States' treatment of Gerardo Cruz-Sanchez while he was detained at CoreCivic's Otay Mesa Detention Center violated the FTCA, 28 U.S.C. § 2674.

125.   As a direct, proximate, and foreseeable result of the negligent acts, omissions and conduct of the Defendant United States and its agents, Plaintiffs suffered damages in an amount according to proof at the time of trial.

/ / /

/ / /

**CLAIM 3:   FTCA Claim against Defendant United States for negligent training and supervision.**

126.   Plaintiffs reassert and re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

127.   Defendant United States had a duty to use reasonable care in the training and supervision of its employees. Defendant United States had a duty to properly train and supervise its employees to use reasonable care in evaluating the health of detainees, including material witnesses, and determining the proper and adequate course of treatment for a detainee suffering from pneumonia. Defendant United States had a duty to properly train and supervise its employees to summon medical care for detainees whom they knew, or had reason to know, required medical care.

128.   Defendant United States breached its duty of care such that Gerardo Cruz-Sanchez's prolonged health crisis was deliberately ignored and Gerardo Cruz-Sanchez died as a result. Defendant United States caused harm to Plaintiffs, including physical pain and suffering, terror, mental anguish, humiliation, degradation, and financial loss.

129.   As a direct, proximate, and foreseeable result of Defendant United States' breach of its duty of care, Plaintiffs suffered damages in an amount according to proof at the time of trial.

**CLAIM 4:  FTCA claim against Defendant United States for negligent infliction of emotional distress.**

130.   Plaintiffs reassert and re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

131.   Defendant United States and its employees engaged in reckless and negligent conduct causing Plaintiffs to suffer emotional distress. When Plaintiff

Paula Garcia Rivera received the corpse of her husband, and her family members were shocked and traumatized to see his face bruised, his wrists with deep red marks and bruises, and his ears swollen and distended.

132.   As a direct, proximate and foreseeable result, Plaintiffs suffered serious emotional distress and defendants' outrageous conduct was the cause of the emotional distress suffered by Plaintiffs.

### CLAIM 5:   Violation of Bane Act (California Civil Code 52.1) as to Defendants CoreCivic, Inc.; C.O. Landin; and Does 1-20

133.   Plaintiffs reassert and re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

134.   The California Legislature has declared that it violates the state civil rights statutes for any person to interfere with the exercise or enjoyment by any individual of his rights secured by the United States Constitution or state or federal law. This includes any interference of these rights by threats, intimidation, coercion or attempted threats, intimidation or coercion.

135.   The defendants interfered with Gerardo Cruz-Sanchez's right to basic medical care through threats and intimidation. Similarly, the defendants also interfered with Gerardo Cruz-Sanchez's right to be free from torture when the defendants ignored his medical crisis and threatened him to stop requesting medical care.

136.   This interference with Gerardo Cruz-Sanchez's rights was perpetrated by the defendants in violation of California Civil Code Section 52.1.

137.   Due to the violation of Plaintiffs' rights by defendants, Plaintiffs suffered damages in an amount according to proof at the time of trial.

138.   Plaintiffs are also entitled to statutory civil penalties set forth in Civil Code § 52.1, attorney fees and costs of suit incurred herein.

### CLAIM 6:   Negligence as to Defendants CoreCivic, Inc.; C.O. Landin; and Does 1-20.

139.   Plaintiffs reassert and re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

140.   As alleged herein, Gerardo Cruz-Sanchez was a material witness at CoreCivic's Otay Mesa Detention Center between February 10 to February 26, 2016.  Defendants have a special relationship with their detainees. Because immigration detainees, including material witnesses, at CoreCivic's Otay Mesa Detention Center are deprived of their liberty, it becomes defendants' duty to care for their health, safety, and welfare. The duty owed is a special affirmative, nondelegable duty to the detainees. Defendants' duties included, but were not limited to: providing reasonable care in evaluating the health of detainees and determining the proper and adequate course of treatment; providing proper care for a detainee suffering from pneumonia; and summoning medical care for detainees whom they knew, or had reason to know, required immediate medical care. Defendants' conduct towards Gerardo Cruz-Sanchez constituted a want of even scant care and an extreme departure from the ordinary standard of conduct in the context of the situation. This grossly negligent conduct resulted in Gerardo Cruz-Sanchez's death.

141.   Defendants breached their duty of care and caused irreparable harm to Plaintiffs, including physical pain and suffering, terror, mental anguish, humiliation, degradation and financial loss.

142.   As a direct and proximate result of defendants' grossly negligent conduct, Gerardo Cruz-Sanchez suffered a horrible, painful death.  Plaintiffs are entitled to recover compensatory damages in an amount according to proof at the time of trial.

143.   As alleged herein, defendants were guilty of oppression, fraud, and/or malice as defined in California Civil Code §3294, and Plaintiffs should recover, in addition to actual damages, exemplary and punitive damages to make an example of and to punish defendants, in an amount according to proof at the time of trial.

### CLAIM 7:  Wrongful Death as to Defendants CoreCivic, Inc.; C.O. Landin; and Does 1-20.

144.   Plaintiffs reassert and re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

145.   Gerardo Cruz-Sanchez's wife, Plaintiff Paula Garcia Rivera, has suffered and continues to suffer loss of society, companionship, comfort, care, guidance, financial support, and other spousal services as a result of her husband's preventable death.

146.    The loss of her husband has been devastating to Paula Garcia Rivera and her family.

### CLAIM 8:  Negligent Training and Supervision as to Defendants CoreCivic, Inc.; C.O. Landin; and Does 1-20.

147.   Plaintiffs reassert and re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

148.   Defendants had a duty to use reasonable care in the training and supervision of its employees. Defendants had a duty to properly train and supervise its employees to use reasonable care in evaluating the health of detainees, including material witnesses, and determining the proper and adequate course of treatment for a detainee suffering from pneumonia. Defendants had a duty to properly train and supervise its employees to summon medical care for detainees whom they knew, or had reason to know, required medical care.

149.   Defendants breached their duty of care such that Gerardo Cruz-Sanchez's prolonged health crisis was deliberately ignored and Gerardo Cruz-Sanchez died as a result. Defendants caused harm to Gerardo Cruz-Sanchez and his wife, Paula Garcia Rivera, including physical pain and suffering, terror, mental anguish, humiliation, degradation, and financial loss.

150.   As a direct, proximate, and foreseeable result of defendants' breach of their duty of care, Plaintiffs suffered damages in an amount according to proof at the time of trial.

**CLAIM 9:   Negligent Infliction of Emotional Distress as to Defendants CoreCivic, Inc.; C.O. Landin; and Does 1-20.**

151.   Plaintiffs reassert and re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

152.   Defendants engaged in reckless and negligent conduct causing Plaintiffs to suffer emotional distress. When Plaintiff Paula Garcia Rivera received the corpse of her husband, she and her family members were shocked and traumatized to see his face bruised, his wrists with deep red marks and bruises, and his ears swollen and distended.

153.   As a direct, proximate and foreseeable result, Plaintiffs suffered serious emotional distress and defendants' outrageous conduct was the cause of the emotional distress suffered by Plaintiffs.

**CLAIM 10: Breach of duty owed by special relationship between Jailer and Jailee as to Defendants CoreCivic, Inc.; C.O. Landin; and Does 1-20.**

154.   Plaintiffs reassert and re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

155.   As alleged herein, Gerardo Cruz-Sanchez was a material witness at CoreCivic's Otay Mesa Detention Center between February 10 to February 26,

2016. Defendants had undertaken by contract to provide detention facilities to the United States. In so doing, Defendants assumed the United States' obligation to provide adequate medical treatment. Defendants' duties included, but were not limited to: providing reasonable care in evaluating the health of detainees and determining the proper and adequate course of treatment; providing proper care for a detainee suffering from pneumonia; and summoning medical care for detainees whom they knew, or had reason to know, required immediate medical care.

156.   Defendants were deliberately indifferent to the medical needs of Gerardo Cruz-Sanchez and failed to treat his pneumonia symptoms with proper medical treatment and instead let the sickness slowly and painfully kill Gerardo Cruz-Sanchez over the course of weeks.

157.   Defendants breached their duty of care and caused irreparable harm to Plaintiffs, including physical pain and suffering, terror, mental anguish, humiliation, degradation and financial loss.

158.   Defendants' indifference was callous and cruel, constituting malice as defined in California Civil Code § 3294. Plaintiffs should recover, in addition to actual damages, exemplary and punitive damages to make an example of and to punish defendants, in an amount according to proof.

## VI.  RELIEF REQUESTED

159.   For general damages and compensatory damages in an amount according to proof;

160.   For punitive and exemplary damages against all defendants (except governmental entities) sued in their individual capacity as permitted by law (Cal. Civ. Code § 3294);

161.   Civil penalties as provided by law;

26

162.   Declaratory and injunctive relief remedying the continued policies, customs and practices governing how defendants attend to the medical care and health of detainees at CoreCivic's Otay Mesa Detention Center;

163.   Plaintiffs' attorney fees and court costs under state law for the prosecution of her state law claims;

164.   Legal interest on all damages awards from the date of judicial demand until paid;

165.   Costs of suit;

166.   And for such other and further relief as the Court may deem proper.

Respectfully submitted,

Dated:        October 5, 2017                 */s/Angela K. Zugman*
                                              ANGELA K. ZUGMAN
                                              Attorney for Plaintiffs

PLAINTIFFS' SECOND AMENDED COMPLAINT
17-CV-00569-BEN-NLS

# EXHIBIT A

**ANGELA K. ZUGMAN**
California State Bar No. 216374
LAW OFFICE OF ANGELA K. ZUGMAN
1010 2nd Avenue, Suite 1800
San Diego, California  92101
Phone Number: (619) 787-5334
Fax Number: (619) 924-2201
Email: akzugman@gmail.com

Attorneys for Plaintiffs

**TIMOTHY A. SCOTT**
California Bar No. 215074
**NICOLAS O. JIMENEZ**
California Bar No. 295057
LAW OFFICES OF
TIMOTHY A . SCOTT, APC
1350 Columbia Street, Suite 600
San Diego, California 92101
Phone Number: (619) 794-0451
Fax Number: (619) 652-9964
Email: tscott@timscottlaw.com
       noj@timscottlaw.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Estate of Gerardo Cruz-Sanchez, by and through his successor-in-interest Paula Garcia Rivera; and Paula Garcia Rivera, individually and in her capacity as successor-in-interest, <br><br> Plaintiffs, <br><br> v. <br><br> The United States of America; CoreCivic, Inc. formerly known as Corrections Corporation of America (CCA); C.O. Landin, in his official and individual capacity; and Does 1-30. <br><br> Defendants. | Civil Action No. 17-CV-00569-BEN-NLS <br><br> **Declaration of Paula Garcia Rivera** |

I, Paula Garcia Rivera, declare under penalty of perjury as follows:

1.   I am over the age of 18 and am competent to testify in this matter.

2.   I am the wife of Gerardo Cruz-Sanchez, who died on February 29, 2016, in San Diego, California.

3.   No proceeding is now pending in the State of California or Mexico for the administration of the Estate of Gerardo Cruz-Sanchez.

4.   I am the successor in interest to Gerardo Cruz-Sanchez, as defined in Section 377.11 of the California Code of Civil Procedure, and succeed to his interest in the above-captioned action under California Probate Code § 6402(b).

1    5.    No other person has a superior right to commence the above-captioned action or to
2          be substituted for Gerardo Cruz-Sanchez in the above-captioned action.

3

4          I declare under penalty of perjury under the laws of the State of California that the
5    foregoing is true and correct and that this declaration is executed on _Feb   26_,
6    2017 at _Zilacaro_. Mexico.

7

8

9

                                                    Paula Garcia Rivera
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          2                    *Declaration of Paula Garcia Rivera*
                                                               *Rivera v. United States, et al.*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Estate of Gerardo Cruz-Sanchez, by and through sucessor-in-interest Paula Garcia Rivera; Paula Garcia Rivera, individually and in her capacity as succesor-in-interest.

**(b)** County of Residence of First Listed Plaintiff    Mexico
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See attachment.

## DEFENDANTS

United States of America; CoreCivic Inc; C.O. Landin, individually and in his official capacity; Does 1-30, inclusive.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☒ 2   U.S. Government Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☒ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding     ☐ 2   Removed from State Court     ☐ 3   Remanded from Appellate Court     ☐ 4   Reinstated or Reopened     ☐ 5   Transferred from Another District *(specify)*     ☐ 6   Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Federal Tort Claims Act
Brief description of cause:
Wrongful death, negligence, negligent training and supervision, Bane Act, intentional infliction of emotional distress,

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
05/03/2017

SIGNATURE OF ATTORNEY OF RECORD
s/ Timothy A. Scott

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## ATTACHMENT TO CIVIL COVER SHEET

I.(c) Attorneys for Plaintiffs

**ANGELA K. ZUGMAN**
California Bar No. 216374
LAW OFFICE OF ANGELA K. ZUGMAN
1010 2nd Avenue, Suite 1800
San Diego, California 92101
Phone Number: (619) 787-5334
Fax Number: (619) 924-2201
Email: akzugman@gmail.com

**TIMOTHY A. SCOTT**
California Bar No. 215074
**NICOLAS O. JIMENEZ**
California Bar No. 295057
LAW OFFICES OF
TIMOTHY A. SCOTT, APC
1350 Columbia St., Suite 600
San Diego, California 92101
Phone Number: (619) 794-0451
Fax Number: (619) 652-9964
Email: tscott@timscottlaw.com
noj@timscottlaw.com