UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF GERARDO CRUZ-SANCHEZ, by and through his successor-in-interest Paula Garcia Rivera, et al., Plaintiffs, v. THE UNITED STATES OF AMERICA, et al., Defendants. | Case No.: 17-cv-569-AJB-NLS **ORDER GRANTING THE UNITED STATES' MOTION TO DISMISS** (Doc. No. 43) |

Pending before the Court is Defendant the United States of America's ("the Government") motion to dismiss or in the alternative motion for summary judgment. (Doc. No. 43-1.) Plaintiffs Paula Garcia Rivera, individually and in her capacity as successor-in-interest and the Estate of Gerardo Cruz-Sanchez by and through his successor-in-interest Paula Garcia Rivera (collectively referred to as "Rivera") opposes the motion. (Doc. No. 45.) Pursuant to Civil Local Rule 7.1.d.1, the Court finds the matter suitable for determination on the papers and without oral argument. As will be explained in greater detail below, the Court **GRANTS** the Government's motion.

## BACKGROUND

The following facts are taken from Rivera's second amended complaint ("SAC")

1

and are construed as true for the limited purpose of resolving the instant motion. *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247 (9th Cir. 2013).

The instant matter revolves around the arrest, incarceration, and eventual death of Gerardo Cruz-Sanchez. (*See generally* Doc. No. 41.) Sanchez was a resident of Mexico at the time of his death. (*Id.* ¶ 6.) Sanchez's wife, Rivera, at all times relevant to this lawsuit, is a resident of Mexico and is the duly appointed successor-in-interest to the Estate of Sanchez. (*Id.*)

At the time of Sanchez's arrest, he had agreed to work with the Government and testify as a witness to the crime of alien smuggling.[1] (*Id.* ¶¶ 1, 6.) However, as Sanchez could not post bail he was admitted to CoreCivic's Otay Mesa Detention Center on February 11, 2016. (*Id.* ¶¶ 1, 14.) Defendant CoreCivic is a for-profit Maryland corporation that owns and operates jails, prisons, and other correctional facilities throughout the United States under contract with various government entities. (*Id.* ¶ 8.)

After entering the facility, a U.S. Public Health Service ("USPHS") nurse performed an initial assessment on Sanchez where he informed the nurse that he had no complaints and did not require any medications. (*Id.* ¶¶ 15, 16.) A few days after being admitted, Sanchez developed flu like symptoms, including a headache, sore throat, painful burning sensations, a persistent cough, nasal congestion, fatigue, and loss of appetite. (*Id.* ¶ 24.)

On February 14, 2016, Sanchez was seen by USPHS Nurse J. Alix. (*Id.* ¶ 26.) Sanchez explained his symptoms, which had persisted over two days, and Nurse Alix noted that Sanchez's appointment was due to an upper respiratory infection. (*Id.* ¶¶ 27, 28.) However, Nurse Alix did not order a chest x-ray or refer Sanchez to a licensed physician. (*Id.* ¶¶ 29, 30.) Instead, Sanchez was given Ibuprofen and sent back to his cell. (*Id.* ¶ 31.)

Over the next few days, Sanchez's symptoms worsened. (*Id.* ¶ 32.) As a result, Sanchez submitted another sick call request and was seen by USPHS Nurse Harris on

---

[1] Sanchez was to be a material witness in Case No. 16cr405-BAS, <u>United States v. Ortega-Gonzalez</u>. (Doc. No. 41 ¶ 6.)

February 16, 2016. (*Id*. ¶ 33.) During this visit, Sanchez described his pain as a 9 out of 10 and informed Nurse Harris that he had been suffering from a cough, body aches, and sore throat for about a week. (*Id*. ¶¶ 34, 35.) Nurse Harris did not order a chest x-ray and did not refer Sanchez to a licensed physician. (*Id*. ¶¶ 36, 37.) Sanchez was then again given Ibuprofen and sent back to his cell. (*Id*. ¶ 38.)

On February 17, 2016, Sanchez submitted another sick call request and this time was seen by USPHS physician's assistant J. Avalos. (*Id*. ¶ 39.) After explaining his symptoms again, Avalos noted in his chart that Sanchez had a "viral etiology vs. bacterial or allergy." (*Id*. ¶ 43.) Unfortunately, like the previous medical professionals, Avalos did not order a chest x-ray, and he did not check Sanchez's oxygen levels or order a blood culture. (*Id*. ¶¶ 44–46.) Sanchez was then sent back to his cell with another dose of Ibuprofen and Promethazine—an allergy medication. (*Id*. ¶ 48.) On February 21, 2016, the same sequence of events occurred again, but this time Sanchez was seen by USPHS nurse Byington. (*Id*. ¶¶ 49–52.)

By February 22, 2016, as a result of Defendants' supposed inactions, Sanchez's health continued to deteriorate to a point that he was coughing up blood that saturated his clothes and bed sheets. (*Id*. ¶¶ 53, 89.) Between February 22 and February 26, despite Sanchez and his cellmate Alejandro Chavez's requests that he receive urgent medical treatment, Sanchez received no medical care. (*Id*. ¶¶ 54–56.) Specifically, Defendant C.O. Landin refused to assist Sanchez in submitting additional sick call requests. (*Id*. ¶ 68.)

On February 26, 2016, a medical emergency was called by CoreCivic staff and Sanchez was brought to the medical facility and was examined by Dr. Propst. (*Id*. ¶ 73.) After examining him, Dr. Propst diagnosed Sanchez with "acute respiratory distress w/burning chest pain, cough, subcut emphysema, hypoxemia, tachypnea, [and] tachycardia[.]" (*Id*. ¶ 76.) 911 was then called and Sanchez was transported by ambulance to the emergency room at Scripps Mercy Hospital in Chula Vista, California. (*Id*. ¶ 77.)

According to post-mortem records, "at the emergency room, the medical staff intubated [Sanchez] and placed him on mechanical ventilation. His examination and

3

17-cv-569-AJB-NLS

laboratory test results showed him with diagnoses of pneumomediastinum with extensive subcutaneous emphysema, hypoxemia, acute kidney injury, healthcare associated pneumonia, new onset of diabetes and hypokalemia." (*Id.* ¶ 78.) On February 29, 2016, eighteen days after Sanchez was admitted to the Otay Mesa Detention Center, he was pronounced dead. (*Id.* ¶ 80.) His health diagnoses were: (1) Aystyolic cardiac arrest secondary to metabolic acidosis; (2) Multifocal pneumonia with acute respiratory distress syndrome; (3) Hypoxic respiratory failure secondary to multifocal pneumonia and acute respiratory syndrome; (4) Acute kidney injury secondary to acute tubular necrosis; (5) Hyperkalemia secondary to acute kidney injury; and (6) Pneumomediastinum and subcutaneous emphysema. (*Id.*)

In sum, Rivera asserts that Sanchez's death could have been prevented if Defendants did not deliberately, oppressively, and maliciously ignore his medical crisis. (*Id.* ¶ 82.) Moreover, Rivera contends that CoreCivic has a widespread practice and policy of tolerating and encouraging deliberate indifference to known serious medical needs by refusing to provide higher level care and refusing to transfer inmates to the hospital in cases of life threatening medical needs. (*Id.* ¶ 106.) Thus, as a result of CoreCivic's disregard for its non-delegable duty to ensure the health and safety of Sanchez, an individual in the custody of its Otay Mesa Detention Center, it is liable for Sanchez's death. (*Id.* ¶ 115.)

On April 1, 2016, thirty-two days after his death, Sanchez's body was delivered to Rivera in a gray steel box. (*Id.* ¶¶ 84, 85.) When Rivera viewed her husband's body, his face was bruised, his writs had deep red marks and bruises, and his ears were swollen and distended. (*Id.* ¶ 86.) As a result of the way in which Sanchez's body was purportedly mistreated, Rivera experienced shock and trauma. (*Id.* ¶ 87.)

Rivera filed her complaint on March 22, 2017. (Doc. No. 1.) On May 3, 2017, Rivera filed an amended complaint. (Doc. No. 5.) Rivera was then granted leave to amend her complaint on October 4, 2017. (Doc. No. 40.) Rivera's second amended complaint was filed on October 5, 2017. (Doc. No. 41.) Shortly thereafter, the Government filed the instant motion, its motion to dismiss or motion for summary judgment. (Doc. No. 43.) On April

17, 2018, the Honorable Judge Roger T. Benitez recused himself from the instant case. (Doc. No. 65.)

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's complaint. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "[A] court may dismiss a complaint as a matter of law for (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim." *SmileCare Dental Grp. v. Delta Dental Plan of Cal.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation and internal quotation marks omitted). However, a complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this determination, a court reviews the contents of the complaint, accepting all factual allegations as true and drawing all reasonable inferences in favor of the non-moving party. *See Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007).

Notwithstanding this deference, the reviewing court need not accept legal conclusions as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is also improper for a court to assume "the [plaintiff] can prove facts that [he or she] has not alleged . . . ." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

**DISCUSSION[2]**

A.    Judicial Notice

The Government requests judicial notice of the Performance-Based National

---

[2] The Court will analyze the Government's motion under the lens of Federal Rule of Civil Procedure 12(b)(6). Though this case was first filed in early 2017, the Court finds that it is still at the early stages of litigation and the pleadings are still not established.

Detention Standards ("PBNDS") and the underlying contract between it and CoreCivic. (Doc. No. 43-1 at 11.) Rivera does not oppose the request. (*See generally* Doc. No. 45.)

Federal Rule of Evidence 201 states that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Here, the Government argues that judicial notice is appropriate as Rivera's operative complaint references both of the above-mentioned documents and because they are both public records. (Doc. No. 43-1 at 11.) The Court agrees.

Presently, Rivera's complaint explicitly references the PBNDS and how these standards applied to the care Sanchez received and should have received. (Doc. No. 41 ¶ 93.) Additionally, the complaint specifically mentions and even quotes from the contract between the Government and CoreCivic. (*Id.* ¶ 101.) Thus, both documents are incorporated by reference. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may, however, consider certain materials . . . documents incorporated by reference . . . without converting the motion to dismiss into a motion for summary judgment."). Moreover, courts routinely take judicial notice of "[p]ublic records and government documents available from reliable sources on the Internet[.]" *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015).

Based on the foregoing, the Government's request for judicial notice is **GRANTED**.

B.   FTCA Claims

In general, the Government seeks to dismiss each of Rivera's FTCA causes of action. (*See generally* Doc. No. 43-1.) In a brief five-page opposition, Rivera challenges each of the Government's contentions. (*See generally* Doc. No. 45.)

///
///
///
///

6

### *i.     Sovereign Immunity*[3]

The Government's sovereign immunity assertions focus solely on arguing that it cannot be held liable for the alleged inactions of CoreCivic employees. (Doc. No. 43-1 at 11.) Specifically, the Government argues that "to the extent that [Rivera] would have this Court hold [it] liable for the alleged actions or inactions of CoreCivic employees" it cannot be held liable for torts committed by its contractors. (*Id.* at 11–12.)

"Absent a waiver of sovereign immunity, a wrongful death suit against the United States would be barred under the sovereign immunity doctrine." *Schwarder v. United States*, 974 F.2d 1118, 1121 (9th Cir. 1992); *see also United States v. Mitchell*, 445 U.S. 535, 538 (1980) (holding that as a general matter, the United States, as sovereign, is immune from suit unless it consents to be sued). However, the FTCA permits parties to assert tort claims against the United States under particular circumstances, and thus effects a limited waiver of sovereign immunity. *See* 28 U.S.C. § 1346. Specifically, this waiver extends only to "the negligent or wrongful act or omission of any employee of the Government . . . ." *Id.* at (b)(1).

Under the FTCA's definition of an "employee of the government," employees include officers or employees of any federal agency, as well as members of the military or naval forces. 28 U.S.C. § 2671. It also includes "persons acting on behalf of a federal

---

[3] Though not completely clear, the Court notes that the Government seems to concede that the SAC has adequately pled its liability for the actions of the USPHS commissioned corps officers, who provided health care and medical case management to Sanchez while he was housed at the Otay Mesa Detention Facility. The complaint clearly alleges that the USPHS employees are federal agency employees under the U.S. Immigration and Customs Enforcement Heath Service Corps. (Doc. No. 41 ¶¶ 12, 15, 26, 39.) Thus, the Court finds that to the extent the Government sought to dismiss any claims against it in relation to the medical professionals working at CoreCivic, that motion would have been denied by the Court. *See Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) ("Under the FTCA's limited waiver of sovereign immunity, the United States is liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment . . . .") (citing 28 U.S.C. § 1346 (b)(1)).

agency . . . ." *Id.* The statute expressly excludes from the definition of "federal agency," however, "any contractor with the United States." *Id.* Thus, the FTCA does not waive the United States' immunity from liability for the negligent or wrongful acts or omissions of independent contractors. *See United States v. Orleans*, 425 U.S. 807, 814 (1976) ("Since the United States can be sued only to the extent that it has waived its immunity, due regard must be given to the exceptions, including the independent contractor exception, to such waiver[.]"). This independent contractor exception, however, has its limitations. The United States can be subjected to liability for acts of its contractors if the plaintiff shows that the government controlled and supervised the "detailed physical performance" and "day to day operations" of the contractor. *Autery*, 424 F.3d at 956 (citation omitted).

Presently, based off of the contract incorporated by reference, it is unquestionable that CoreCivic employees are contractors employed by the Government. (Doc. No. 43-2 at 3–6.) Through this contract, Rivera then attempts to allege that USPHS and CoreCivic were required to ensure that all employees were provided pre-service and annual training. (*Id.* ¶ 101.) Additionally, Rivera contends that the Government through its agents the U.S. Immigration and Customs Enforcement and USPHS, is required to provide direct patient care to the federal detainees at CoreCivic's Otay Mesa Detention Center. (*Id.* ¶ 90.) Furthermore, Rivera asserts that CoreCivic is responsible for the implementation of policies, procedures, acts, and omissions of its employees and agents. (*Id.* ¶ 115.)

Regrettably, under the standard delineated above, these general and broad allegations fail to adequately demonstrate that the independent contractor exception does not apply to the Government under the circumstances of this case. For instance, Rivera's complaint does not allege that the Government directed the performance of CoreCivic employees or that the Government supervised or directed (or negligently supervised or directed) the day-to-day operations of CoreCivic's Otay Mesa Detention Center. Without more, the complaint fails to adequately allege that CoreCivic contractors can be considered employees of the Government. *See Johnson v. United States*, 132 F. App'x 715, 716 (9th Cir. 2005) (finding that the independent contractor exception to the FTCA did not apply as

the evidence indicated that the United States Postal Service "dictated every aspect" of the employee's daily employment activities including how many times to turn a mop over as well as when and how to place safety signs).

Accordingly, as the SAC does not sufficiently allege that the Government controlled or supervised its CoreCivic contractors or correctional officers, the Government has not waived sovereign immunity for the liability of the alleged inactions or actions of CoreCivic employees. *See Valadez-Lopez v. Chertoff*, 656 F.3d 851, 858 (9th Cir. 2011) ("The government may be sued under the [FTCA] 'for the actions of a government contractor and its employees' only if the contractor is acting as an agent of the government, i.e. 'if the government has the authority to control the detailed physical performance of the contractor and supervise its day-to-day operations.'") (citation and internal quotation marks omitted); *see also Laurence v. Dep't of Navy*, 59 F.3d 112, 114 (9th Cir. 1995) (finding that the independent contractor exception applied based on the government's failure to "exercise[] the requisite 'substantial supervision' by controlling the detailed physical performance and day-to-day work of [the contractor]."); *Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1987) ("There must be <u>substantial supervision</u> over the day-to-day operations of the contractor in order to find that the individual was acting as a government employee.") (emphasis added).

### *ii. Negligent Training and Supervision*

The Government claims that Rivera's cause of action for negligent training and supervision is barred by the discretionary function exception. (Doc. No. 43-1 at 15–17.) Rivera argues that USPHS contravened its own policy and thus the discretionary function does not apply. (Doc. No. 45 at 4.)

The discretionary function exception precludes claims against the United States which are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). In order to determine whether the discretionary function exception applies, a court must

engage in a two-step inquiry: (1) the court must determine whether the challenged conduct involves an element of judgment or choice, *see Berkovitz v. United States*, 486 U.S. 531, 536 (1988); and (2) if the conduct involves some element of choice, the court must determine whether the conduct implements social, economic, or political policy considerations, *see Gasho v. United States*, 39 F.3d 1420, 1435 (9th Cir. 1994).

It is not quite clear how Rivera seeks to adequately plead this cause of action. As currently pled, the complaint only asserts that the medical professionals that saw Sanchez did not order a chest x-ray for him or refer him to a licensed physician. (Doc. No. 41 ¶¶ 29, 30, 36, 45, 51, 67.) Rivera then states that ICE detention facilities are required to follow the PBNDS, that the Government had a duty to properly train and supervise its employees, and that the Government breached its duty. (*Id*. ¶¶ 93, 127, 128.) Unfortunately, as a whole, these allegations are simply unavailing legal conclusions that fail to identify any specific requirement in a statute, regulation, or policy that prevents the Government from exercising discretion in training and supervising its employees.

Moreover, allegedly negligent and reckless employment, supervision, and training of medical professionals falls squarely within the discretionary function exception. *See Gager v. United States*, 149 F.3d 918, 920–22 (9th Cir. 1988) (holding that the government's decision to forego employee training in mail bomb detections was a discretionary one); *see also Gourgue v. United States*, No. 12CV-1490-LAB, 2013 WL 1797099, at *2 (S.D. Cal. Apr. 29, 2013) ("[T]he Government's decision of how to train and supervise its employees is the kind of decision that the discretionary function was designed to protect because it is susceptible to a policy analysis.").

Rivera argues that the discretionary function exception does not apply to instances when United States actors do not follow their own self-imposed policy. (Doc. No. 45 at 4 (citing *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018 (9th Cir. 1989).) In *Kennewick*, the court illuminated that "the discretionary function will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow because then the employee has no rightful option but to adhere to the

directive." *Id*. at 1026 (citation and internal quotation marks omitted). The Court notes that though Rivera correctly cites to the holding in *Kennewick*, the complaint still fails to allege a federal policy that the Government failed to follow in relation to the hiring and supervision of its employees. As such, the Government's motion to dismiss this cause of action is **GRANTED**.

### iii. Negligent Infliction of Emotional Distress

California law recognizes that "there is no independent tort of negligent infliction of emotional distress" in that "[t]he tort is negligence, a cause of action in which a duty to the plaintiff is an essential element." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 984 (1993). The existence of a duty is a question of law. *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal. 3d 583, 588 (1989). Moreover, there are two variants to the theory of negligent infliction of emotional distress ("NIED")—bystander and direct victim cases. *See Hillblom v. Cty. of Fresno*, 539 F. Supp. 2d 1192, 1209 (E.D. Cal. 2008) (citing *Wooden v. Raveling*, 61 Cal. App. 4th 1035, 1037 (1998)).

This matter presents a bystander case as Rivera was not physically impacted or injured, but instead allegedly witnessed the injury of someone else due to a defendant's negligence. *See Hillblom*, 539 F. Supp. 2d at 1209 (citation omitted); *see also Burgess v. Superior Court*, 2 Cal. 4th 1064, 1072–73 (1992) (explaining that a bystander case arises in the context "of physical injury or emotional distress caused by the negligent conduct of a defendant with whom the plaintiff had no preexisting relationship, and to whom the defendant had not previously assumed a duty of care beyond that owed to the public in general."). In the absence of physical injury or impact to Rivera, damages for emotional distress in a bystander case should only be recoverable if Rivera: "(1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and, [sic] (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness." *Fife v. Astenius*, 232 Cal. App. 3d 1090, 1092 (1991) (citation omitted).

Here, it is unquestionable that the complaint adequately pleads the first criteria as

Rivera is the victim's wife. (Doc. No. 41 ¶ 6.) However, the remainder of the elements are clearly not met. For instance, even though Sanchez's body was delivered to Rivera purportedly bruised and battered, and the Court does not deny that the state of Sanchez's remains as alleged would shock his loved ones, Rivera fails to assert that she was present at the scene where the injury took place. Accordingly, this cause of action, as currently pled, does not suffice under California law and is **DISMISSED**.[4] *See Wilks v. Hom*, 2 Cal. App. 4th 1264, 1271 (1992) (explaining that the plaintiff must be at the scene and be sensorially aware of the accident and the necessarily inflicted injury); *see also Ortiz v. HPM Corp.*, 234 Cal. App. 3d 178, 185–86 (1991) (finding NIED properly pled as the wife in the case saw her husband being crushed in a machine).

## **CONCLUSION**

The events of the SAC as pled are both disheartening and frightening. Regrettably, as a whole, Rivera's FTCA causes of action against the Government are not adequately pled. Accordingly, the Court **GRANTS** the Government's motion to dismiss. Finding that amendment would not be futile, the Court **GRANTS** Rivera **twenty-one (21) days** from the date of this Order to file an amended complaint curing the deficiencies noted herein. Failure to file an amended complaint will result in dismissal of this case.

**IT IS SO ORDERED**.

---

[4] Rivera cites to *Christensen v. Superior Court*, 54 Cal. 3d 868 (1991), to support her claim of NIED upon seeing Sanchez's remains. (Doc. No. 45 at 3.) However, the court in *Christensen* was analyzing a situation where human remains were mistreated by a crematorium. *Id*. at 899. In this specific type of case, the court concluded that where a defendant has undertaken to provide a service, "the very purpose of which is to alleviate existing and avoid future emotional distress arising from the death[,]" a plaintiff may seek relief based on the breach of a duty owed directly to the plaintiff. *Id*. at 899–90. It is clear that the facts in *Christensen* are completely inapplicable to the present matter.

12

Dated: July 2, 2018

_____
Hon. Anthony J. Battaglia
United States District Judge