UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF GERARDO CRUZ-SANCHEZ, et al.,<br><br>Plaintiffs<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants | Case No.: 17-CV-0569-AJB-NLS<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

**I.**

**The Action**

This is a negligence action under the Federal Tort Claims Act for the wrongful death of Gerardo Cruz-Sanchez ("Mr. Cruz-Sanchez" or "Decedent") on February 29, 2016.

This case involves the arrest, incarceration, and eventual death of Gerardo Cruz-Sanchez. On February 4, 2016, Mr. Cruz-Sanchez was arrested and detained by the United States. Approximately a week later, after being detained at another federal detention center, he was transferred to Otay Mesa Detention Center ("OMDC"), which is owned and operated by CoreCivic pursuant to a correctional services agreement with the federal government. During his incarceration at OMDC, Mr. Cruz-Sanchez received medical

evaluations and treatment from employees of the United States on February 11, February 12, February 14, February 16, February 17, and February 21, 2016. On February 26, 2016, Mr. Cruz-Sanchez was sent to the hospital. On February 29, 2016, Mr. Cruz-Sanchez died.

Plaintiffs allege that Defendant United States failed to properly and timely diagnose and treat Mr. Cruz-Sanchez.[1]

The United States contended that its ICE Health Service Corps ("IHSC") professionals met the standard of care in providing medical services to Decedent during his stay at OMDC. The United States further asserted that Decedent's non-attendance at sick-call after his February 21, 2016 examination, during the critical period when his pneumonia developed and rapidly progressed, was the cause of Decedent's death.

## II.

## Jurisdiction and Venue

Federal jurisdiction is invoked under 28 U.S.C. § 1346(b)(1). Venue is proper in the Southern District of California because all conduct giving rise to the claims alleged in the complaint occurred in San Diego County.

## III.

## The Proceedings

The case proceeded to trial on March 22, 2022, and concluded on March 28, 2022. The issues tried were set out in the Final Pretrial Order in this case. (ECF No. 171.) Following the trial, and upon review of the testimony and documentary evidence, the agreed facts, the arguments of counsel, and the relevant legal authorities, the Court now makes the following findings based on the credible evidence and the reasonable inferences to be drawn therefrom. These findings were made based upon a preponderance of the

---

[1] Plaintiffs also allege that CoreCivic detention officer, Defendant Landin, interfered with Mr. Cruz-Sanchez's ability to receive medical care and that Defendant CoreCivic failed to train Defendant Landin regarding his duty to provide Mr. Cruz-Sanchez access to adequate medical treatment. On March 28, 2022, a jury unanimously found CoreCivic and Defendant Landin not liable for claims of violation of the Bane Act, negligence, negligent supervision, and wrongful death. The evidence was presented on both the case against CoreCivic and Landin and the United States jointly.

credible evidence. The liability standard is that of negligence in the medical context: a medical professional who fails to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful medical professionals would in similar circumstances. This level of skill, knowledge, and care is sometimes referred to as "the standard of care." *See* CACI 400, 500 and 501.

The negligence elements beyond duty are breach, causation, and damages. *Id*. Causation is determined using the "substantial factor test" under California Law. *See Mitchell v. Gonzales,* 54 Cal. 3d 1041 (1991); Restatement (Second) of Torts § 431. "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm." CACI 430.

## IV.

## Findings of Fact

Any finding of fact which is more appropriately a conclusion of law is to be deemed as such.

The following facts were admitted by the parties[2] and are adopted by the Court:

1. On February 11, 2016, Mr. Cruz-Sanchez was transferred from Metropolitan Correctional Center ("MCC") to OMDC where he was held until February 26, 2016.
2. Between February 11 through February 26, 2016, Decedent and Alejandro Chavez-Lopez ("Chavez") were assigned to the J-pod housing unit at OMDC.
3. While at OMDC, Decedent had medical encounters with PHS staff on February 11, February 12, February 14, February 16, February 17 and February 21, 2016.
4. Decedent did not attend sick call after February 21, 2016.
5. On February 26, 2016, Decedent was sent to the hospital.
6. On February 29, 2016, Decedent died.

---

[2] *See* ECF. No. 215.

The Court further finds, based on a preponderance of the credible evidence, the following:

7. On February 11, 2016, Decedent was medically screened by Nurse Ednacort. Decedent was reported to say "I am good." No reports of pain were elicited, nor were past or current medical problems reported. Vital signs (temperature, heart rate, respiration rate) were within normal limits. There were no complaints of pain and he weighed in at 167 pounds. He was noted to have a BMI of 29.58 with 25 being the desired level. Physical exam was negative. The record notes a negative chest x-ray on February 8, 2016 at the MCC. He was medically cleared for custody.

8. On February 12, 2016, Decedent was seen at his request by Nurse Wu with pain in the right upper eyelid. No other symptoms were noted. Blood pressure was elevated (145/84), but all other vitals were normal. Weight and BMI were unchanged. A stye was diagnosed, instructions to manage the condition were provided, medication for pain was ordered, and a follow up with a Physician's Assistant was scheduled.

9. On February 14, 2016, Decedent was seen at his request by Nurse Alix for complaints of "headache and sore throat" and "pain" for 2–3 days. No other symptoms were noted. Blood pressure was elevated (141/75), weight and BMI remained unchanged, and other vital signs were normal. An oxygen saturation reading was taken and showed 96%, a reading within normal limits. Lungs were clear on auscultation bilaterally. An Upper Respiratory Infection ("URI") was diagnosed and treated. Decedent was advised to return to sick call if symptoms worsen, and Decedent verbalized understanding.

10. On February 16, 2016, Decedent was seen on sick call by Nurse Harris, with complaints of cough, body aches, and sore throat for "one week." All vitals were normal save for the BMI and weight that were unchanged. Lungs were noted to be "normal, clear to auscultation bilaterally, no wheezes, rales or rhonchi." An

oxygen saturation reading was taken and showed 99%, a reading within normal limits. Medication and instructions to manage the symptoms were given. Decedent was advised to return to sick call if symptoms worsen, and Decedent verbalized understanding.

11. Plaintiffs' claim that a referral to a midlevel provider would be required at this point under applicable guidelines, particularly the NCCH guideline that reads, "When indicated, referral to the clinician's clinic is made for the inmate to see a physician or mid-level practitioner. In general, when a patient presents for nonemergency health services more than two times with the same complaint, and has not seen a physician, the patient receives an appointment to do so." (Exh. 228 at 7.) No referral was made; however, Decedent saw a mid-level practitioner the following day. The guideline reference to "When indicated" was explained by Dr. Propst as allowing the medical professional some discretion in their medical judgment. (*See* ECF No. 233 at 95.) No breach of the standard of care resulted nor was any harm done.

12. On February 17, Physician Assistant Avalos conducted the follow-up appointment for the stye. Decedent reported the stye was improving but reported viral symptoms over the prior 3 days. The symptoms were noted as subjective fever at night, chills, nausea through the day, lack of appetite, scratchy throat. No other symptoms or complaints were noted by Decedent, including "night sweats" or a "productive cough," which Dr. Wilcox assumed existed but later acknowledged were absent. (*See* ECF No. 234 at 85.) Indeed, Dr. Wilcox projected the "night sweats" and the "cough" as his criticism of Avalos' care and claimed Avalos breached the standard of care by not taking an oxygen saturation reading on this date or ordering other tests.

13. Exam records on February 17 also noted pain stated as "body aches" were described by the patient. All vitals were normal save for the BMI and weight that were unchanged. On physical exam, the lungs were noted as CTAB,

      meaning "Lungs Clear to Auscultation Bilaterally." Avalos assessed the situation as an unspecified viral infection. No oxygen saturation reading was taken given the lack of clinical indications. Decedent was advised to return to sick call if symptoms worsen, and Decedent verbalized understanding.

14. There were no clinical indications of pneumonia on February 17, 2016. Dr. Wilcox testified that rapid respiration rate, sharp stabbing chest pains with deep breathing, shortness of breath, and abnormal breathing sounds are the signs and symptoms to look for, and that none were present on February 17, nor for that matter on February 12th, 14th, or 16th. (*See* ECF No. 234 at 93–98.)

15. On February 21, 2016, Decedent was seen by Nurse Byington for a health assessment. The notes were entered two days later. All vitals were normal save for the weight, now 166 (one pound less than all prior exams), and BMI was not calculated. By appearance, Decedent was noted to be in "no acute distress, well developed and well nourished." While Decedent denied any current medical concerns, he did report pain at 4 out of 10 without specificity as to location. Physical exam was normal, and the lungs are noted as "clear to auscultation bilaterally." Decedent was "[e]ducated on the sick call process and to follow-up via sick call as needed." Dr. Lederman signed off on the note on February 25, 2016. Decedent appeared to have improved from the URI for which he was evaluated one week prior. That would be consistent with the normal course of a URI.

16. Of note, Plaintiff's Expert Dr. Wilcox conceded on cross examination that Nurse Byington did follow appropriate guidelines on February 21. (*See* ECF. No. 234 at 105.)

17. Defense Expert Dr. Vilke found no clinical signs or symptoms suggesting pneumonia as of February 21, 2016, and further concluded that the medical practitioners met the standard of care in treating Decedent. On the facts as described herein, the Court agrees.

18. On February 22, 2016, Decedent was visited by his attorney Jonathan Frank and an interpreter Danielle Leyva. Frank and Leyva testified that Decedent appeared ashen, pale, breathless, coughing, and very ill. Frank advised the officer on duty, who summoned someone else, and Frank shared his concern. This description of Decedent's condition was a change when compared to the clinical notes of the February 21, 2016 visit. According to the Pod Log Book (Exh. 43), Decedent declined to go to dinner.

19. Decedent did not request sick call, summon help, or ask for assistance thereafter until an emergency was called by Detention Officer Landin on February 26, 2016.

20. On February 26, 2016, now 5 days after the last medical visit, Decedent was taken to the clinic by staff when Defendant Landin called for medical assistance. His condition had clearly deteriorated since his last visit to the clinic. Nurse Moreno testified to Decedent's distress and noted that he had coughed up blood-tinged mucous. Dr. Propst attended to Decedent and found him in need of hospital transport. 911 was called and Decedent was transferred to the hospital. Dr. Propst noted increased heart rate, blood pressure, and respiration. The oxygen saturation rate was down to 90%, and oxygen was administered. Lungs were clear to auscultation except in the right lateral zone where some rales/squeak was noted on inspiration. Decedent's weight and BMI were unchanged at 167 and 29.58, respectively.

21. There is no credible evidence that Decedent coughed up blood prior to February 26, 2016.

22. Dr. Wilcox would expect pneumonia to have an onset of two to three weeks but admits it can come on rapidly. (*See* ECF. No. 234 at 83.) Dr. Propst says pneumonia can develop within hours or overnight, although it is more typically 2, 3, or 4 days. (*See* ECF. No. 233 at 57.) Dr. Vilke testified consistent with Dr. Propst.

23. A consultation by Dr. Reznik on February 26, 2016, noted on physical exam that, other than the fact he was quite sick, Decedent appeared as a "well nourished and well appearing man."

24. As noted above, on February 29, 2016, Decedent died from sepsis secondary to pneumonia and organ failure. No medical negligence was alleged concerning the hospitalization and care provided from February 26, 2016 to the date of Decedent's death. As a result, detailed findings of fact concerning the clinical course in the hospital are unnecessary.

25. Detainees in the OMDC could access medical by putting in for sick call on a sign-up sheet available in the morning in their Pod. There were also medical request forms available in the Pod generally, and a detainee could approach a guard with a request for medical. The guards did not provide medical care. Their role was to assist the detainees in gaining access to medical services as noted.

26. The Pod Log recorded activities and comings and goings for each day in the Pod. A review of the log shows that Decedent's Pod had a constant presence of detention officers who made security checks of the pod every thirty minutes during Decedent's stay, and that a variety of other detention and government representatives were present at times. A review of the log shows visitors coming and going for informal security checks, cell searches, taking/returning detainees to medical, admission of new and release of pending detainees.

27. The Log also shows that except for dinner on February 22, 2016, Decedent was signed in and out of his Pod for meals.

28. Statements by Alejandro Chavez concerning Decedent's lack of appetite and not taking meals for days are contradicted by the log, and the multiple records regarding Decedent's stable weight readings from February 11, 2016 to February 26, 2022. Plaintiff's medical expert acknowledged that not eating for a week would lead to weight loss. (ECF No. 234 at 84.)

29. The evidence is clear that Decedent decided not to return to the clinic for care despite his familiarity with the protocol, which he had utilized previously, and the instructions of the medical staff to return if symptoms worsened. The suggestion, based on statements of witness Chavez, is that Decedent was unhappy with the care he was receiving as he did not feel it was doing him any good. While Chavez is hardly credible, given his financial motive in this case, the inference that this was why the sick calls stopped is logical. Reference to Decedent not wanting to go to medical was also referenced in the post incident mortality review report. (*See* Exh. 224 at 004.)

30. Decedent's failure to seek out further medical care as symptoms worsened on February 22, 2016, was a substantial factor in his deteriorating condition and ultimate development of pneumonia, sepsis, and multiple organ failure that could not be successfully treated.

31. The evidence does not support a pneumonia developing in the Decedent for two to three weeks. (*See Wilcox*, ECF. No. 234 at 52.) Decedent had a URI which was properly treated and better by February 21. The medical records and log entries belie that Decedent was as sick as witness Chavez claims. Chavez lacks credibility for many reasons, above all the wealth of inconsistent testimony in opposition. That Mr. Cruz-Sanchez contracted pneumonia is undeniable. Regrettably, he chose not to access medical care which might have saved his life.

## V.

## Conclusions of Law

The Court finds that the medical providers are not responsible for Mr. Cruz-Sanchez's tragic death due to sepsis, pneumonia, and organ failure. There was no failure to diagnose and treat. The medical clinic staff provided reasonable and appropriate medical care, but Mr. Cruz-Sanchez decided not to return to the clinic when his condition suddenly changed and rapidly deteriorated during the five days from February 22 to

February 26, 2016. Decedent had repeatedly been advised to return to the clinic if his symptoms worsened, and he verbalized his understanding each time. Regrettably, he did not follow the medical professional's advice.

The United States medical staff satisfied the standard of care in providing care to Decedent, and none of their actions were a substantial factor in bringing harm to him.

## VI.

## Conclusion

Based on the foregoing, the Court finds in favor of Defendant United States of America, and against Plaintiffs the Estate of Gerardo Cruz-Sanchez and Paula Garcia Rivera on all claims alleged against said Defendant. The Clerk of Court is directed to enter judgment according to this order. The Clerk of Court is also directed to enter judgment for Defendant's CoreCivic and David Landin and against Plaintiffs the Estate of Gerardo Cruz-Sanchez and Paula Garcia Rivera on all claims pursuant to the jury verdict in that portion of this case.

**IT IS SO ORDERED**.

Dated:  April 7, 2022

Hon. Anthony J. Battaglia
United States District Judge